UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DR. JACKIE CAVNER                                                                                           PLAINTIFF

v.                                                  No. 2:21-CV-02069

UNIVERSITY OF ARKANSAS
FORT SMITH and BOARD OF
TRUSTEES OF THE UNIVERSITY
OF ARKANSAS                                                                                               DEFENDANTS

**OPINION AND ORDER**

Defendant Board of Trustees of the University of Arkansas ("the University") has filed a motion for summary judgment (Doc. 20), along with a brief (Doc. 21) and statement of undisputed material facts (Doc. 22) in support.[1]  Plaintiff Dr. Jackie Cavner filed a response (Doc. 23), brief (Doc. 24), and statement of facts (Doc. 25) in opposition to the University's motion.  The University then filed a reply (Doc. 26).  The Court, having reviewed and considered all these filings and the exhibits attached thereto, grants the University's motion for the reasons given below.

**I.      Background.**

The University of Arkansas Fort Smith ("UAFS") has an agreement with Mercy Hospital in Fort Smith ("Mercy") under which UAFS faculty and students provide services at Mercy.  This allows students in UAFS's nursing degree program to acquire clinical experience.

Dr. Cavner is an assistant professor at UAFS, where she has been employed since 2012.  She teaches in UAFS's School of Nursing.

---

[1] The only other defendant in this action, the University of Arkansas Fort Smith, was dismissed by this Court's Opinion and Order dated May 11, 2021 (Doc. 10), on the grounds that it is not an entity subject to suit.  Thus the Board of Trustees of the University of Arkansas is the sole remaining defendant in this case.

1

On September 11, 2018, several of Dr. Cavner's nursing students reported to her that earlier that same day, while they were observing the delivery of a baby at Mercy, the attending OB/GYN physician made an inappropriate remark while providing anesthetic to the mother. Specifically, the students alleged that the physician pinched the patient's perineum and stated to the students that "if I pinched you there, you would feel it." (Doc. 20-1, p. 2) (internally numbered pp. 6:18–6:21).[2] Dr. Cavner was not present to hear the remark when it was made. Two weeks later, on September 25, Dr. Cavner reported the incident to a manager at Mercy.

On October 3, Dr. Cavner received a phone call from Mercy's head obstetrician, Don Phillips, who informed her that he and the other physicians in the group had agreed that students would no longer be allowed to observe deliveries at Mercy. That same day, Dr. Cavner informed her supervisor at UAFS, then-Associate Dean Dr. Lynn Korvick, of the incident and of her conversation with Dr. Phillips. This was the first time that Dr. Cavner informed anyone at UAFS of the students' complaint. *See id.* at 3–4 (internally numbered pp. 12:19–13:6). During that conversation, Dr. Korvick reminded Dr. Cavner that these facts should be reported to the Title IX office, which Dr. Cavner then did. *See id.* at 4 (internally numbered pp. 13:9–13:10).

On October 4, Dr. Cavner spoke with Mercy's Talent Development Specialist, Jordan Nelson, who apologized for the incident and assured Dr. Cavner that the students would be allowed back in deliveries. Nevertheless, when Dr. Cavner was touring Mercy with a group of new students five days later on October 9, she was stopped by the charge nurse and told that the group was not allowed in any rooms or deliveries. However, aside from this October 9 incident, the students

---

[2] There is some conflicting evidence in the record as to exactly what the attending physician said. For example, a student has submitted an affidavit testifying that the statement took the form of a question directed at the female students: "You'd be able to feel that if I did it to you, huh?" *See* Doc. 25, p. 17, ¶ 3. Regardless, there is no dispute that the statement made at least some of the students very uncomfortable and that they reported it to Dr. Cavner later that same day.

resumed their normal rotations and clinicals at Mercy, and their progression in the program was not affected. *See id.* at 6 (internally numbered pp. 21:25–22:25).

In this lawsuit, Dr. Cavner alleges that the University retaliated against her for reporting the October 2018 incident at Mercy. She brings her claims under Title VII of the Civil Rights Act, which prohibits employers from retaliating against employees for opposing unlawful sexual discrimination. The University has moved for summary judgment on Dr. Cavner's claims, arguing that there is no material factual dispute in this case and that the University is entitled to judgment as a matter of law. Dr. Cavner's allegations and the parties' respective arguments for and against summary judgment will be discussed in Section III below. But first, the Court will explain the legal standard that applies to summary judgment motions in general, as well as the burden-shifting framework that applies to employment discrimination cases in particular.

## II.    Legal Standard.

On a motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party, makes all reasonable factual inferences in the nonmovant's favor, and only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016). The nonmovant may not rely only on allegations in the pleadings, but must identify specific and supported facts that will raise a genuine and material issue for trial. *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012) (quoting *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997)). Facts are material when they can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Id*. "While the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Haggenmiller*, 837 F.3d at 884 (quotations omitted).

**III.    Discussion.**

In employment retaliation cases, there are two ways that a plaintiff can defeat a motion for summary judgment. One is to show direct evidence of retaliation. "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Young-Losee v. Graphic Packaging Intern., Inc.*, 631 F.3d 909, 912 (8th Cir. 2011). "'Direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.*

In the absence of direct evidence, a plaintiff claiming employment retaliation may still defeat a motion for summary judgment by creating an inference of retaliation under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This framework involves a three-step process. At the first step, the plaintiff must establish a *prima facie* case that would permit a reasonable jury to find that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct. *See Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1064 (8th Cir. 2020). If the plaintiff establishes a *prima facie* case, then at the second step the burden shifts to the defendant to "show a legitimate reason for its actions." *See id.* (internal alterations omitted). "If such a reason is proffered," then at the third step the burden shifts back to the plaintiff to "present evidence

that (1) creates a question of fact as to whether [the defendant]'s reason was pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation." *See id.*

The University argues that Dr. Cavner cannot satisfy either of these approaches. Dr. Cavner responds that she can satisfy both of them—either of which would be sufficient to survive summary judgment. Ultimately the Court agrees with the University.[3]

Dr. Cavner first argues that she has direct evidence of retaliation in the form of Mercy's or Dr. Phillips's decision to prohibit UAFS students from observing any further deliveries at Mercy after Dr. Cavner reported the September 11, 2018 incident. But there is an obvious problem with this argument, which is that neither Mercy nor Dr. Phillips was Dr. Cavner's employer—rather, the University was. And it is undisputed that, as already noted above, when Dr. Cavner informed her supervisor at UAFS of the incident, her supervisor actually urged her to report it to the Title IX office.

Dr. Cavner attempts to sidestep this problem by arguing that the University, and particularly Dr. Carolyn Mosley, who was then Dean of the College of Health Science, made an "initial decision to concede to" Dr. Phillips's ban on student participation. *See* Doc. 24, p. 6. The sole evidence that Dr. Cavner presents in support of this claim is her own testimony that on October 4, 2018, she heard from someone other than Dr. Mosely that Dr. Mosely "seem[ed] to want to honor the physicians' request to not allow students in deliveries." *See* Doc. 20-1, pp. 4–5 (internally numbered pp. 16:3–20:10). Dr. Cavner's deposition testimony is unclear as to who she heard this from. Initially she testified that she was told this by Dr. Korvick on October 4. *See id.*

---

[3] Because the Court agrees that Dr. Cavner has provided neither direct evidence of discrimination nor evidence sufficient to create an inference of retaliation under the *McDonnell Douglas* framework, it is not necessary to reach the other arguments raised in the University's motion regarding the defenses of collateral estoppel and failure to exhaust administrative remedies.

at 4 (internally numbered pp. 16:14–16:21). However, after checking her notes, Dr. Cavner appeared to revise her testimony to say that in fact she heard this from Title IX Coordinator Dr. Lee Krehbiel, who heard it from the Provost, Dr. Georgia Hale, who in turn heard it from Dr. Mosley—and that somehow Dr. Krehbiel "also made me believe that that was the same thing that Dr. Korvick said." *See id.* at 4–5 (internally numbered pp. 16:17–17:3, 19:10–19:25).

This testimony is rather confusing and of questionable admissibility.[4] But at any rate, evidence that Dr. Mosley initially "seem[ed] to want" to honor Mercy's request is not evidence that Dr. Mosley actually took any adverse action towards Dr. Cavner, nor even that Dr. Mosley had any authority or ability to make Mercy readmit UAFS students. Nor is it evidence that Dr. Mosley's initial inclination in this regard was motivated by any retaliatory purpose. Even if it were, then it would only be evidence of retaliation against *the students* rather than against Dr. Cavner. Dr. Cavner has not offered any direct evidence that the University retaliated against her for engaging in protected activity under Title VII. Therefore, *McDonnell Douglas* provides the appropriate framework for evaluating her claims.

As mentioned above, the first step under *McDonnell Douglas* is that the plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally linked to

---

[4] "[I]nadmissible hearsay evidence cannot be used to defeat summary judgment." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010). However, for purposes of this motion the Court will assume that this testimony comes within one or more of the exceptions to the rule against hearsay, as that question has not been briefed by the parties. Even so, the Court notes that this testimony would likely be vulnerable to exclusion at trial under Federal Rule of Evidence 403: the fact that plaintiff heard from person A that person B said something about what person C "seem[ed] to want," has minimal apparent probative value that is likely substantially outweighed by the dangers of unfair prejudice and confusing the issues. But at the summary judgment stage the Court will not discount the testimony on those grounds. *Cf. Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015).

the protected conduct. This Court already held, in its opinion and order dated May 11, 2021, that Dr. Cavner engaged in conduct that was protected by Title VII of the Civil Rights Act when she complained of the September 11, 2018 incident that her students suffered at Mercy. *See* Doc. 10, p. 4. There is no factual dispute that Dr. Cavner engaged in this conduct. Thus only the second and third elements of her *prima facie* case are at issue in this motion.

Dr. Cavner alleges a variety of adverse actions that were taken against her by the University in retaliation for her reporting of the September 11 incident. The parties agree that the following nine events or categories of events comprise the totality of the allegedly adverse actions in question:

(1) the University's refusal to allow Dr. Cavner to teach research for the spring 2019 semester;

(2) the University's denial of Dr. Cavner's request in spring 2019 for travel funding to attend a conference;

(3) the University's denial of Dr. Cavner's request for a salary raise in May 2019;

(4) retaliation Dr. Cavner allegedly suffered for her April 2019 participation in a grievance that was filed against Dean Mosley and in a related FOIA request;

(5) the appointment in August 2019 of someone other than Dr. Cavner to the newly-created Clinical Coordinator position;

(6) the passing over of Dr. Cavner in summer 2019 for appointment to an Accelerated Level Coordinator position;

(7) Dr. Cavner's non-reappointment in November 2019 to the Interim Executive Director position;

  (8) the University's failure to award Dr. Cavner an endowed professorship in December 2019; and

  (9) a change to Dr. Cavner's fall 2020 teaching schedule.

However, Dr. Cavner emphasizes that these nine events should be considered not only individually but also in the aggregate. The Court will first address each of these events individually, and then will conclude by considering them in the aggregate.

  Several of these nine events can immediately be dispensed with because they "are akin to the sort of trivial harms that do not rise to the level of retaliation" under Eighth Circuit precedent. *See, e.g.*, *Recio v. Creighton Univ.*, 521 F.3d 934, 940 (8th Cir. 2008). For an event to qualify as an adverse retaliatory employment action, the event must be *materially* adverse—and merely failing to receive one's preferred teaching schedule does not inflict the "significant harm" necessary to qualify as materially adverse. *See id.* Nor does denial of permission to attend a preferred training session. *See Clegg v. Ark. Dept. of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007). Title VII does not immunize employees "from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Thus the first, second, and ninth events listed above do not qualify as actionable adverse employment actions.

  The fourth category of events listed above—retaliation Dr. Cavner allegedly suffered for her April 2019 participation in a grievance against Dean Mosley and in a related FOIA request—can also be dispensed with because the grievance and related FOIA request at issue had nothing to do with Title VII of the Civil Rights Act. Title VII protects workers from discrimination in the workplace on the basis of their membership in various protected classes such as race, religion, or sex. It also protects workers from retaliation for protesting such discrimination. But Title VII

8

does not protect workers from retaliation for simply criticizing a supervisor's authoritarianism or incompetence. The April 2019 grievance that Dr. Cavner and other UAFS faculty members signed regarding Dean Mosley does not protest any sort of Title VII discrimination. Instead, its criticisms are all of Dean Mosley's general management style. The first few lines of criticism are quoted here by way of example, as they are representative and typical of the criticisms listed throughout the document:

1. POOR LEADERSHIP
   - Criticizes after the tasks are completed, rather than giving guidance up front or throughout the task.
   - Micromanages office hours, breaks, simulation activities/schedules, parking, evaluation formatting, student handbook rules etc.
   - Allows administrative assistants to criticize faculty.
   - Places blame on faculty, rather than taking responsibility as a leader.
   . . . .

*See generally* Doc. 20-5. There is nothing in Title VII that prohibits supervisors from retaliating against employees who make such complaints. Nor does Title VII prohibit supervisors from retaliating against employees for making FOIA requests about them.

This leaves only the third, fifth, sixth, seventh, and eighth of the nine events listed above as possible grounds for Dr. Cavner's Title VII claims in this case. All five of these events are instances when Dr. Cavner was denied appointments to various positions or a salary increase. For analytical ease, the Court will assume for the sake of argument that Dr. Cavner has made a *prima facie* showing of retaliation with respect to each of these five instances, and will proceed to the second step of the *McDonnell Douglas* framework. As previously noted, that second step requires the University to come forward with evidence that it had legitimate, non-retaliatory reasons for its actions. For each of these events, the University has provided such evidence, as described below. Thus, for each of these events the third step of the *McDonnell Douglas* framework also comes into play, where the burden shifts back to Dr. Cavner to present evidence that the University's reasons

9

were pretextual so as to permit a reasonable inference that its true motive was retaliatory. Each of these five events will be discussed in turn.

First, with respect to the denial of Dr. Cavner's requested salary raise in May 2019: Dr. Korvick testified that the University ordinarily does not grant raises for merit, but that instead raises are given only through promotion or cost of living increases. *See* Doc. 20-5, p. 13 (internally numbered pp. 47:1–47:12). In May 2019, Dr. Cavner, who was an assistant professor at the time, requested a merit raise of $3,000.00. The University declined this request because the only way to facilitate the raise would have been to demote her to the position of Senior Instructor, and then promote her back to Assistant Professor after she put in sufficient time at the lower rank—which is never done. *See id.* at 12–13 (internally numbered pp. 45:18–46:25). Dr. Cavner does not dispute that the University acted in accordance with its uniform policies in this regard. Thus the University has shown a legitimate, non-retaliatory reason for its action here. Dr. Cavner points out that the campus handbook actually authorizes merit raises under certain circumstances—but the provision in question only authorizes such raises when they "are funded by the State and the university" with applicable guidelines to "be posted in advance." *See* Doc. 25, p. 69, § E.3.8 ("Merit Pay"). There is no evidence in the record that Dr. Cavner was eligible for any merit raise that was funded at the time of her request. Absent something more, the fact that the University chose not to bend its standard policies or procedures to accommodate her unusual request is not evidence of pretext.

As for the three 2019 incidents in which other individuals were selected over Dr. Cavner for the positions of Clinical Coordinator, Accelerated Level Coordinator, and Interim Executive Director: the University has presented evidence that the individuals who ultimately were hired for these positions were well-qualified for them. Indeed, the person who eventually was hired as

Interim Executive Director had even been nominated and recommended for the position by Dr. Cavner (though of course it should be noted that Dr. Cavner also nominated and recommended herself for the position). *See* Doc. 20-1, p. 20 (internally numbered pp. 78:2–78:22). Thus the University has shown legitimate, non-retaliatory reasons for its hiring decisions here, and the burden shifts back to Dr. Cavner to provide evidence that these reasons were pretextual.

Dr. Cavner, for her part, has not presented any evidence that any of these individuals were *not* well-qualified for these positions. Instead, she argues that she was more qualified than they were. But this Court's review of the record indicates that neither Dr. Cavner nor her competitors appeared better qualified overall for the positions at issue, but that rather they simply presented different counterbalancing strengths and weaknesses relative to each other. Dr. Cavner had a more advanced degree than the person who was selected for the Clinical Coordinator position, but unlike the person who was chosen over her, Dr. Cavner had requested not to be placed in certain clinical settings for which the Clinical Coordinator would be responsible. *See* Doc. 20-2, pp. 11–12 (internally numbered pp. 38:2–38:17, 39:7–42:3). Similarly, Dr. Cavner had a more advanced degree and longer tenure at UAFS than the person who was selected for the Accelerated Level Coordinator position, *see* Doc. 20-1, p. 29 (internally numbered pp. 114:9–114:20), but the person who was hired had prior experience working directly with the particular students who were in the accelerated program at that time, *see* Doc. 20-9, 4 (internally numbered pp. 12:8–13:21). As for the person who was chosen over Dr. Cavner for the Interim Executive Director position: she had roughly twice as much experience in nursing education than Dr. Cavner had, and both of them had obtained doctoral-level degrees. *See* Doc. 20-1, p. 20 (internally numbered pp. 80:4–80:21)

When a hiring decision must be made between similarly-qualified applicants, then the decisive factors for such decisions will almost inevitably be subjective ones; absent something

11

more, evidence that an employer weighed some subjective factor more heavily than another is not evidence of pretext. *See Pierce v. Marsh*, 859 F.2d 601, 603–04 (8th Cir. 1988). The critical question for purposes of pretext analysis is not whether this Court would have valued the applicants' qualifications differently from how the University did, but rather whether there is any evidence that calls into question whether the University itself actually believed its proffered non-retaliatory reasons for the hiring decisions. Such evidence need not "directly contradict or disprove [the] defendant's articulated reasons for its actions," but it must at least "raise genuine doubt as to the legitimacy of the defendant's motive." *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017–18 (8th Cir. 2005) (quoting *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 n.8 (8th Cir. 1994)). Dr. Cavner has not presented any such evidence here.

The sole remaining alleged adverse action is the University's decision in December 2019 not to award Dr. Cavner an endowed professorship after she applied for it. The University says the reason she was not hired for this position was that the official position description included a "Required Education" component that the hired person's "[b]ackground must be appropriate for rank of Associate Professor or Professor," whereas Dr. Cavner only held the rank of Assistant Professor (which is lower than that of Associate Professor or Professor). *See* Doc. 20-13, p. 2. Dr. Cavner does not dispute that the official position description contained this requirement, but she notes that the donor's conditions for the endowment do not include any such restriction. *See* Doc. 25, pp. 49–50. In the Court's view this fact is a red herring and is not evidence of pretext. It does not, for example, call into question whether the official requirements for the position were uniformly applied to all applicants; nor does it create any basis for inferring that the University's reason for denying her application was something other than that she did not meet the qualifications set forth in the official position description.

In conclusion, Dr. Cavner has not presented sufficient evidence to support an inference that any particular adverse action by the University was done in retaliation for her having engaged in conduct that is protected by Title VII of the Civil Rights Act. Dr. Cavner emphasizes that all of these events should be viewed in the aggregate for their cumulative effect rather than as discrete and isolated events. But if anything, viewing these events in their broader context only weighs even more heavily in favor of granting summary judgment here. As already mentioned, Dr. Cavner reported the September 11, 2018 incident at Mercy to the University's Title IX office *on the suggestion of her own supervisor* at the University. Furthermore, it is undisputed that Dr. Cavner has not suffered any decrease in her normal teaching load or salary, nor experienced any change to her employment benefits. She is currently "in the process of going up for associate professor" and has received letters of support in that regard from her supervisor, her executive director, and her college committee; and her supervisor has testified that she "would be very surprised if [Dr. Cavner] did not receive that promotion." *See* Doc. 20-2, p. 6 (internally numbered pp. 18:11–19:6). When the record is viewed in its totality, the big picture it presents is not of a professor who is being retaliated against by her employer for having reported sexual harassment of students; rather, the picture it presents is of a professor whose career is flourishing and whose future with her employer is bright.

**IV.  Conclusion.**

IT IS THEREFORE ORDERED that the University's motion for summary judgment (Doc. 20) is GRANTED. Judgment will be entered separately.

IT IS SO ORDERED this 2nd day of March, 2022.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE